In the Matter of ESTABLISHMENT INSPECTION OF: WEDGEWOOD VILLAGE PHARMACY, INC. d/b/a Wedgewood Pharmacy.

No. 03–2049.

United States District Court,
D. New Jersey.

July 7, 2003.

Frank A. Luchak, Esquire, Duane Morris LLP, Cherry Hill, NJ, and Howard M.

Hoffmann, Esquire, Duane Morris LLC, Chicago, IL, appearing pro hac vice, for Movant Wedgewood Village Pharmacy, Inc., d/b/a Wedgewood Pharmacy.

Robert D. McCallum, Jr., Esquire, Assistant United States Attorney General, and Christopher J. Christie, Esquire, United States Attorney for the District of New Jersey by Paul A. Blaine, Esquire, Assistant United States Attorney, Camden, NJ, and Gerald C. Kell, Esquire, Senior Trial Counsel, Washington, DC, for the United States Food and Drug Administration.

### OPINION AND ORDER

ROSEN, United States Magistrate Judge.

## I. INTRODUCTION

Presently before the court is the motion by Wedgewood Village Pharmacy, Inc., d/b/a Wedgewood Pharmacy ("Wedgewood"), to quash a warrant for administrative inspection issued *ex parte* by this court to the United States Food and Drug Administration ("FDA") on March 10, 2003, pursuant to the Federal Food, Drug, Cosmetic Act ("FDCA") 21 U.S.C. § 301, *et seq.* For the reasons discussed below, Wedgewood's motion to quash shall be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The March, 2003 Warrant Application

Wedgewood is a New Jersey licensed pharmacy that has operated in good standing for twenty-two years. (*See* Wedgewood "Motion to Quash Warrant For Inspection Under the Federal Food, Drug, and Cosmetic Act" (hereinafter "Wedgewood Br.") at 7; Wedgewood Reply at 4). Located in Sewell, New Jersey, Wedgewood is owned and operated by George Malmberg, a pharmacist who holds a current and valid New Jersey license. (*Id.*). Wedgewood specializes in compounding, selling, and dispensing pharmaceuticals for human and animal application which it dispenses nationwide. (*See* Wedgewood Br. at 7).

On March 10, 2003, an investigator for the New Jersey District Office of the FDA, duly designated, applied to this court for an administrative inspection warrant for Wedgewood's Sewell, New Jersey, facility. (*See* Application for Inspection Warrant ("Warrant App."), FDA Opp. Br., Ex. A).

By its terms, the FDA warrant application, comprising eighteen pages, was brought pursuant to 21 U.S.C. § 374(a).[1]

---

1. 21 U.S.C, § 374 provides in relevant part:

a) Right of agents to enter; scope of inspection; notice; promptness; exclusions (1) For purposes of enforcement of this chapter, officers or employees duly designated by the Secretary, upon presenting appropriate credentials and a written notice to the owner, operator, or agent in charge, are authorized (A) to enter, at reasonable times, any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce or after such introduction, or to enter any vehicle being used to transport or hold such food, drugs, devices, or cosmetics in interstate commerce; and (B) to inspect, at reasonable times and within reasonable limits and in a reasonable man-

ner, such factory, warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials, containers, and labeling therein. In the case of any person (excluding farms and restaurants) who manufactures, processes, packs, transports, distributes, holds, or imports foods, the inspection shall extend to all records and other information described in section 350c of this title when the Secretary has a reasonable belief that an article of food is adulterated and presents a threat of serious adverse health consequences or death to humans or animals, subject to the limitations established in section 350c(d) of this title. In the case of any factory, warehouse, establishment, or consulting laboratory in which prescription drugs, nonprescription drugs intended for human use, or

The application detailed the legal and factual basis for the FDA's request. As a factual basis, the warrant application first directed the court to a recent development; the United States Drug Enforcement Agency ("DEA") had requested assistance in conducting an "inter-agency" on-site investigation at Wedgewood. (Warrant App., ¶ 3). This inter-agency effort related to "matters currently under investigation," most notably Wedgewood's failure to report the theft of controlled drug substances to the DEA, required under 21 C.F.R. 1301.76(b). The theft of the drug substances may have resulted in overdoses by high school students in October 2001. (Id. at ¶ 2). Relying on the FDCA, the FDA identified several anomalies in Wedgewood's pharmacy practice that the FDA believed supported its position that Wedgewood had violated the Act and, thus, that supported an inspection under Section 374.

The warrant application referenced paragraphs six to eleven as a factual basis for the suspected violations. (See id. at ¶¶ 12–13). Paragraphs six through eight informed the court of Wedgewood's practice of producing Poison Ivy Extract in large quantity, without prescriptions for specific patients, during the period between January and March 1998. This practice was discovered in the inspection completed by the New Jersey State Department of Law and Public Safety, Division of Consumer Affairs, Enforcement Bureau, conducted by Investigator Wayne Nastase on February 27 through March 4, 1998. (Id. at ¶ 7). The FDA had attempted an inspection without a warrant on this issue on February 23, 1998, but had been turned away by owner and CEO of Wedgewood, George J. Malmberg. (Id., ¶ 6). Following Nastase's inspection, and subsequent sharing of information with the FDA, the FDA and Wedgewood representatives entered discussions. The discus-

restricted devices are manufactured, processed, packed, or held, the inspection shall extend to all things therein (including records, files, papers, processes, controls, and facilities) bearing on whether prescription drugs, nonprescription drugs intended for human use, or restricted devices which are adulterated or misbranded within the meaning of this chapter, or which may not be manufactured, introduced into interstate commerce, or sold, or offered for sale by reason of any provision of this chapter, have been or are being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on violation of this chapter. No inspection authorized by the preceding sentence or by paragraph (3) shall extend to financial data, sales data other than shipment data, pricing data, personnel data (other than data as to qualification of technical and professional personnel performing functions subject to this chapter), and research data (other than data relating to new drugs, antibiotic drugs, and devices and subject to reporting and inspection under regulations lawfully issued pursuant to section 355(i) or (k) section 360i, or 360j(g) of this title, and data relat-

ing to other drugs or devices which in the case of a new drug would be subject to reporting or inspection under lawful regulations issued pursuant to section 355(j) of this title). A separate notice shall be given for each such inspection, but a notice shall not be required for each entry made during the period covered by the inspection. Each such inspection shall be commenced and completed with reasonable promptness.
(2) The provisions of the third sentence of paragraph (1) shall not apply to—
(A) pharmacies which maintain establishments in conformance with any applicable local laws regulating the practice of pharmacy and medicine and which are regularly engaged in dispensing prescription drugs or devices, upon prescriptions of practitioners licensed to administer such drugs or devices to patients under the care of such practitioners in the course of their professional practice, and which do not, either through a subsidiary or otherwise, manufacture, prepare, propagate, compound, or process drugs or devices for sale other than in the regular course of their business of dispensing or selling drugs or devices at retail; . . .

sions resulted in Wedgewood's acknowledging that it needed to obtain a Biologic License Application for the product, pursuant to 42 U.S.C. 262(a), (c), to recall the product already distributed, and to cooperate with an FDA inspection regarding the Poison Ivy Extract. (*Id.*, ¶ 8). During the inspection, Mr. Malmberg "verbally promised to cease production and distribution of the Poison Ivy Extract." (*Id.*).

Paragraphs nine to eleven described information gleaned from a February 3, 2003 DEA Report of Investigation, which informed the FDA, *inter alia*, of the following events and practices by Wedgewood: (1) the receipt of an encapsulation machine in May 2002; (2) evidence that Wedgewood was compounding drugs that are "copies of FDA-approved, commercially available products such as diazepam tablets, sildenafil tablets, and several veterinary drug products;" (3) the purchase of 11.5 kilograms of diazepam in the six-month period between August 2001 and February 2002; (4) the purchase of 17 kilograms of boldenone undecylenate in the six-month period between January and July 2002; and (5) the purchase of 30 kilograms of stanozolol in the sixteen-month period between July 2001 and November 2002. (Warrant App., FDA Opp. Br., Ex. A, ¶ 9). The FDA warrant application explained that, for example, the diazepam bulk drug substance purchased by Wedgewood was enough to manufacture over one million 10mg tablets or capsules in the six-month period. (*Id.*, ¶ 10). The FDA warrant application noted that such production is atypical of pharmacy compounding and rather more akin to a commercial drug manufacturer's production. (*Id.*).

The warrant application further indicated that on February 20, 2003, the FDA was informed by New Jersey State Investigator Wayne Nastase that "Wedgewood had a commercial scale mixer and receives excipient materials (i.e. ingredients for drug products that are not the active ingredients) in bags exceeding 50 pounds." (*Id.* at ¶ 11). Nastase also informed the FDA that "Wedgewood Pharmacy routinely manufactures veterinary drug products in bulk, prior to receipt of specific veterinarian prescribing orders." (*Id.*). Finally, Nastase reported to the FDA that Wedgewood was manufacturing versions of sildenafil, the active ingredient in Viagra, in the form of a lozenge, and that testing completed on those lozenges in 1999 indicated that they were "sub-potent." (*Id.*).

Based on this information, the FDA requested that this court sign the "preemptive inspection warrant" to give the FDA "access to production and distribution records to determine the extent to which this firm's activities are consistent with those of a drug manufacturer rather than a retail pharmacy, and to evaluate the extent of violations of the Act, including the new drug and new animal drug approval requirements, and the Act's adulteration provisions." (Warrant App., ¶ 20). The warrant application further described in detail the purpose for the inspection:

(A) determine whether Wedgewood Pharmacy is compounding human drugs that are copies of commercially available FDA-approved products; (B) identify the original manufacturers of bulk drug substances used by Wedgewood Pharmacy to compound human drug products, and determine whether these ingredients have been manufactured in FDA-registered facilities and meet official compendial requirements; (C) determine whether drugs for veterinary use are being compounded in conformance with the AMDUCA implementing regulations in 21 CFR Part 530; (D) determine the frequency and volumes of human drug production batches, the frequency and volumes of shipments, and the number and types of consignees,

e.g., physicians, clinics, hospitals, or other state licensed pharmacies, who are receiving Wedgewood Pharmacy's compounded prescription drugs, in order to determine whether the compounding is being done for other parties for resale; (E) determine, for those products found to be copies of FDA-approved, commercially available products, whether Wedgewood Pharmacy has documentation of individual patients' medical need for particular variations; (F) determine whether the firm has adequate controls in place to assure that its injectable and implantable drug products are sterile; (G) determine whether valid prescriptions for identified individual patients are received prior to dispensing, for each compounded human drug product that is dispensed; (G) determine whether human drug products are being compounded in anticipation of receiving prescriptions, including quantities, and how such amounts compare to the amounts compounded after receiving valid prescriptions; (I) determine whether Wedgewood Pharmacy uses commercial scale manufacturing equipment to compound drug products; and (J) determine whether Wedgewood is compounding any human drug products that have been withdrawn or removed from the market for safety reasons.

(Warrant App., ¶ 21). The FDA then provided the court with a detailed listing of the information they would target in the inspection: "(1) ... Wedgewood Pharmacy facilities, and all things therein, including equipment, finished and unfinished materials, containers, labeling, records (including electronic and computer records), files, papers, processes, controls, and facilities, bearing on whether prescription drugs in-

tended for human use and prescription and non-prescription animal drugs which are adulterated or misbranded within the meaning of the Act, or which may not be manufactured, introduced into interstate commerce, sold, or offered for sale by reason of any provision of the Act, have been or are being manufactured, processed, packed, transported, or held in such facilities, or otherwise bearing on violation of the Act; (2) to collect samples as deemed necessary by FDA; and (3) to take photographs as deemed necessary by FDA." (*Id.* at ¶ 24).

The warrant itself included the name of the establishment to be inspected and a description of the manner and items subject to inspection. (*See* Warrant, Wedgewood Br., Ex. 4). The warrant further provided that the inspection begin "as soon as practicable after the issuance of this warrant and will be completed with reasonable promptness." (*Id.*).

After careful review and consideration, this court signed the warrant on March 10, 2003.[2]

## B. The Inspection

Two FDA investigators, accompanied by a Deputy U.S. Marshal, executed the inspection warrant on March 12, 2003. (FDA Opp. Br. at 3). Wedgewood asserts that the FDA inspectors were accompanied by approximately twelve DEA agents and other U.S. Marshals. (*See* Wedgewood Br. at 2). Malmberg, on advice of counsel, informed the FDA agents that he would not cooperate in the execution of the warrant. (*Id.* at 9). A marshal indicated to Malmberg that if he did not comply, he would be taken into custody immediately. (*Id.*). Malmberg acquiesced under the

2. On the same date this court signed an administrative inspection warrant upon application by the United States Drug Enforcement Administration ("DEA"), pursuant to 21

U.S.C. §§ 878(2) and 880(a) and (b). Wedgewood does not contest the validity of the DEA warrant. Wedgewood Br. at 2.

threat of detainment and permitted the inspection to proceed. However, Malmberg attached a statement of protest to all records and other information collected by the FDA. One of the statements provided that: "I am turning over the records attached to this statement only because of the actually stated threat by the United States Marshall [sic] that if I don't, I will be immediately taken into custody and all the pharmacy's computers, records and more will be immediately seized and removed from the pharmacy by the United States Marshall [sic]." (*Id.*, Ex. 10). Another such statement included reference to "Department of Justice Counsel, Jerry Kell['s]" advice to the same effect. (*Id.*, Ex. 11).

The inspection of Wedgewood under the warrant continued on March 13 and 14, and FDA inspectors indicated to Wedgewood representatives that the FDA planned to continue the inspection on March 18, 2003. (*See* Wedgewood Br. at 2, n. 1). Wedgewood filed the instant motion to quash the FDA warrant on March 17, 2003.

### C.  Motion to Quash

In support of its motion, Wedgewood asserts as fact the following information about itself, claiming that Wedgewood:

- specializes in compounding drugs on the order of a licensed practitioner, [either physician or veterinarian];
- specializes in traditional compounding of drugs for humans and pets (companion animals) and equine animals (*e.g.*, race horses);
- does not compound for livestock (feed animals) or feed producers, and, therefore, presents no potential that its drug compounds will leach into the food chain;
- does *not* compound a drug when a suitable, commercially-manufactured drug is available; and

- compounds "extemporaneously" [meaning] "upon the receipt of the physician's order or from a permissible inventory based on historical ordering patterns."

(*Id.* at 4–5, n. 2–3 (emphasis in original)). Wedgewood maintains that these few facts are "likely uncontested" (Wedgewood Reply at 4); yet, these are precisely the facts that the administrative warrant attacks. Wedgewood supplies no documentary evidence supporting these assertions, relying only upon an affidavit by Mr. Malmberg which attests to the accuracy of the information contained within Wedgewood's motion and reply.

The essence of Wedgewood's motion is its belief that the FDA's application for a warrant is inappropriate because the FDA lacks jurisdiction over state licensed pharmacies under any circumstance. For example, Wedgewood maintains that "[t]here was no justification for applying for the Warrants *ex parte,* other than to prevent Wedgewood from appearing and informing the Court of the FDA's absolute lack of jurisdiction, because Wedgewood is a state-licensed pharmacy." (Wedgewood Br. at 3). In its reply, Wedgewood outlines its position succinctly: "Congress exempted state-licensed pharmacies from registration *and* inspection by the FDA; this was a fact well known to the FDA and Director Axelrad at the time the FDA applied for and commenced execution on the *ex parte* Warrant; compounding, a pharmacy-based activity, is defined by the states and regulated only by state pharmacy boards, not the FDA; the FDA regulates manufacturing by manufacturers; under the explicit language of the Food, Drug, and Cosmetic Act ("FDCA"), even manufacturing performed by pharmacies is exempted from the FDCA and FDA oversight; ... and compounds, by statute and case law, are not—and are incapable of

being—'new drugs.'" (Wedgewood Reply at 3–4).

Despite this and other unequivocal statements in its briefs that the FDA lacks any jurisdiction under any circumstances over pharmacies, during oral argument, counsel for Wedgewood conceded, though grudgingly, that the FDCA contains a limited statutory exemption for pharmacies and that if Wedgewood does not meet the elements of that statutory exemption, then it is subject to FDA regulation under the FDCA. (*See* Transcript of Oral Argument conducted before this court on May 22, 2003 at T38:19–39:4).

Wedgewood also concedes that the government generally has the right to seek a warrant *ex parte*. (Wedgewood Reply at 22). However, Wedgewood maintains that because the FDA knew that its application was not grounded in the law, the FDA acted in bad faith and so vitiated the *ex parte* administrative warrant. (*Id.* at 23–25 and Ex. 1). Finally, Wedgewood contends that the warrant was not based on probable cause. (*See, e.g.,* Wedgewood Br. at 13–17).

## III. DISCUSSION

### A. Standard for Quashing Administrative Warrant Under the FDCA

■ The Supreme Court has long held that a warrant is required for a search to be considered reasonable under the Fourth Amendment, whether conducted in a home or a commercial establishment. *See, e.g., See v. City of Seattle,* 387 U.S. 541, 545, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). "An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable." *New York v. Burger,* 482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (internal citation omitted). Society's tolerance for searches of business establishments exists on a continuum. "An expectation of priva-

cy in commercial premises ... is different from, and indeed less than, a similar expectation in an individual's home." *Id.* at 700, 107 S.Ct. 2636. In the business context, the Court has relaxed the warrant clause of the Fourth Amendment to account for the exigencies of administrative inspections "designed to enforce regulatory statutes." *Id.* at 700, 107 S.Ct. 2636. The Court has gone so far as to hold that "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy ... could exist for a proprietor over the stock of such an enterprise." *Id.* (quoting *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 313, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (internal citations omitted)). "'When a dealer chooses to engage in [a] pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, [and stock] will be subject to effective inspection.'" *Id.* (quoting *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972)). So significant is the necessity for effective inspection that in such "pervasively regulated" industries, the Court has dispensed with the need for a warrant at all. *United States v. Biswell,* 406 U.S. 311, 316–17, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (permitting warrantless inspection in the gun selling industry); *see also New York v. Burger,* 482 U.S. 691, 703–704, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (same in vehicle-dismantling and automobile junkyard industry); *Donovan v. Dewey,* 452 U.S. 594, 602–05, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (same in coal mines); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 76–77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (same in the liquor industry). The Court explained: "The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significant-

ly from the sanctity accorded an individual's home, and that his privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections." *Donovan*, 452 U.S. at 598–99, 101 S.Ct. 2534.

The Court has been vigilant at noting, however, that " 'except in [such] carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' " *Barlow's*, 436 U.S. at 312, 98 S.Ct. 1816 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

While the Supreme Court has never considered the exception, now referred to as the *Colonnade–Biswelll* exception, *Burger*, 482 U.S. at 701, 107 S.Ct. 2636, in the context of the FDCA, the United States Court of Appeals for the Eighth, Ninth, and Sixth Circuits have found the pharmaceutical industry to be so "pervasively regulated" that a warrantless search is permissible under the Fourth Amendment. *See United States v. Jamieson–McKames Pharmaceuticals, Inc.*, 651 F.2d 532 (8th Cir.1981) (holding drug manufacturing industry closely regulated in review of administrative inspection warrant issued to the FDA under FDCA); *accord United States v. Argent Chemical Laboratories, Inc.*, 93 F.3d 572 (9th Cir.1996) (finding pharmaceutical industry "closely regulated" in review of in rem warrant issued to FDA under 21 U.S.C. § 334); *United States v. Acklen*, 690 F.2d 70, 75 (6th Cir.1982) (in review of DEA search warrant under 21 U.S.C. § 880, held pharmaceutical industry is "closely regulated" industry in context of *Colonnade–Biswelll* exception).

The *Colonnade–Biswelll* exception was qualified somewhat in *Barlow's*. There, the Court reviewed the propriety of a warrantless search without consent under sec-

tion 8(a) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 657(a). As the Court interpreted it, section 8(a) "empowers agents of the Secretary of Labor ... to search the work area of any employment facility within the Act's jurisdiction. The purpose of the search is to inspect for safety hazards and violations of OSHA regulations. No warrant or other process is expressly required under the Act." *Barlow's*, 436 U.S. at 309, 98 S.Ct. 1816. The Court discussed the decreased expectation of privacy in commercial property and the "continued vitality" of the *Colonnade–Biswelll* doctrine, "but declined to find that warrantless inspections, made pursuant to [OSHA], of *all* businesses engaged in interstate commerce fell within the narrow focus of this doctrine." *Burger*, 482 U.S. at 701, 107 S.Ct. 2636 (discussing the holding and import of *Barlow's* ) (emphasis in original). While the Court's greatest concern was that the OSHA statute was not limited to one industry, it also expressed concern that the statute did not mention the authorized frequency of inspections. *Barlow's*, 436 U.S. at 316–17, 98 S.Ct. 1816.

▮▮▮ The Court emphasized that regulatory investigators operating under statutes failing the *Colonnade–Biswelll* exception are not without recourse. Reconfirming the process established in *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the Court directed that enforcement need not be curtailed as warrants may be obtained *ex parte* and executed without notice to the establishment being inspected. *Barlow's*, 436 U.S. at 316–320, 98 S.Ct. 1816. Moreover, probable cause in the criminal law sense is not required to support the issuance of an administrative warrant. *Barlow's*, 436 U.S. at 320, 98 S.Ct. 1816. *See also U.S. v. Prendergast*, 585 F.2d 69, 70 (3d Cir.1978) (citing

*Barlow's* ). "For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation ... but also on a showing that 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment].' " *Id.* at 320, 98 S.Ct. 1816 (quoting *Camara*, 387 U.S. at 538, 87 S.Ct. 1727) (footnote omitted).

■■■ This lesser standard of probable cause derives from the general recognition that the expectation of privacy of an owner or operator of a business establishment is tempered by the public interest duly recognized by the established regulatory scheme. The warrant must still fulfill the traditional tasks of "provid[ing] assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria." *Barlow's,* 436 U.S. at 323, 98 S.Ct. 1816. As the Court explained in *Camara:*

> The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant. Such an approach neither endangers time-honored doctrines applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area. It merely gives full recognition to the competing public and private interests here at stake and, in so doing, best fulfills the historic purpose behind the constitutional right to be free from unreasonable government invasions of privacy.

*Camara,* 387 U.S. at 539, 87 S.Ct. 1727 (internal citations omitted).

■■■ "To apply this standard, it is ... necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." *Camara,* 387 U.S. at 534–535, 87 S.Ct. 1727. "In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of the[ ] reasonable goals of code enforcement." *Id.* at 535, 87 S.Ct. 1727. The relevant factors indicative of reasonableness include the government agency's experience of the need for inspection to protect the public health or safety and the nature of the search as compared to the need fulfilled. *Id.* at 538, 87 S.Ct. 1727. Even passage of time without inspection alone can be sufficient to justify issuance of a warrant. *Id.* Once a court determines that the type of inspection is a "reasonable" search of private property within the meaning of the Fourth Amendment, a court must then consider whether "reasonable legislative or administrative standards for conducting [the particular inspection] are satisfied with respect to a particular dwelling." *Id.* This should be an individualized review based upon the specific enforcement scheme. *Id.; Barlow's,* 436 U.S. at 322–34, 98 S.Ct. 1816. Thus, the power to conduct an administrative inspection as well as the manner in which that inspection may be initiated derive from the language of the governing statute and any relevant regulations and procedures as determined by a neutral officer upon review of the warrant. *Barlow's,* 320–21, 98 S.Ct. 1816; *Showers v. Spangler,* 182 F.3d 165, 173 (3d Cir.1999).

■■■ Because the FDA obtained an administrative inspection warrant, this court

need not reach the question of whether the FDCA governs a "pervasively regulated" industry under the *Colonnade–Biswelll* exception.[3] The question only thus before this court is whether the warrant was valid under the above standard.

### B. The FDCA and the Statutory Authority to Inspect

As noted above, the FDA relied upon 21 U.S.C. § 374(a)(1) as authority for the warrant. Subsection (a)(1) has three operative sentences. The first sentence, by its own terms, gives the FDA the authority to enter and inspect things:

> For purposes of enforcement of this chapter, officers or employees duly designated by the Secretary, upon presenting appropriate credentials and a written notice to the owner, operator, or agent in charge, *are authorized* (A) to enter, at reasonable times, any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce or after such introduction, or to enter any vehicle being used to transport or hold such food, drugs, devices, or cosmetics in interstate commerce; and (B) to inspect, at reasonable times and within reasonable limits and in a reasonable manner, such factory, warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials, containers, and labeling therein.

21 U.S.C. § 374(a)(1) (emphasis supplied). The second sentence, as it is related to food adulteration, is not relevant to the instant matter. The third sentence gives the FDA the authority to enter and inspect records and documents and other information related to drugs for human use:

> In the case of any factory, warehouse, establishment, or consulting laboratory in which prescription drugs, nonprescription drugs intended for human use, or restricted devices are manufactured, processed, packed, or held, the inspection shall extend to all things therein (including records, files, papers, processes, controls, and facilities) bearing on whether prescription drugs, nonprescription drugs intended for human use, or restricted devices which are adulterated or misbranded within the meaning of this chapter, or which may not be manufactured, introduced into interstate commerce, or sold, or offered for sale by reason of any provision of this chapter, have been or are being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on violation of this chapter.

21 U.S.C. § 374(a)(1).

All of these rights of inspection are granted "[f]or purposes of enforcement of this chapter[.]" 21 U.S.C. § 374(a).

■■■■ The exemption for pharmacies immediately follows 374(a)(1), is found in 374(a)(2), and provides:

> (2) The provisions of the third sentence of paragraph (1) shall not apply to—
> (A) pharmacies which maintain establishments in conformance with any applicable local laws regulating the practice of pharmacy and medicine and

---

**3.** Wedgewood noted in its motion that when the agents and marshals arrived to execute the warrant, Malmberg objected to the validity of the warrant and attempted to block the inspection. After some discussion, and after the marshal indicated that Malmberg would be taken into custody if he did not allow the inspection, Malmberg permitted the agents to enter. This exchange did not vitiate the inspection. Under *Barlow's*, consent is not required for an inspection conducted pursuant to a valid warrant. 436 U.S. at 312, 98 S.Ct. 1816. Under a warrant, the authority to inspect derives from the neutral judicial officer's order and not from the agency's discretion.

which are regularly engaged in dispensing prescription drugs or devices, upon prescriptions of practitioners licensed to administer such drugs or devices to patients under the care of such practitioners in the course of their professional practice, and which do not, either through a subsidiary or otherwise, manufacture, prepare, propagate, compound, or process drugs or devices for sale other than in the regular course of their business of dispensing or selling drugs or devices at retail; . . .

21 U.S.C. § 374(a)(2). By its own language, the exemption applies only to the third sentence. And by its own language, this exemption has three elements that must be met before a pharmacy may claim an exemption, i.e.:

1. maintain establishments in conformance with any applicable local laws regulating the practice of pharmacy and medicine *and*

2. which are regularly engaged in dispensing prescription drugs or devices, *upon prescriptions of practitioners* licensed to administer such drugs or devices to patients under the care of such practitioners in the course of their professional practice, *and*

3. which do not, either through a subsidiary or otherwise, manufacture, prepare, propagate, compound, or process drugs or devices for sale *other than in the regular course of their business of dispensing or selling drugs or devices at retail.*

21 U.S.C. § 374(a)(2) (emphasis supplied). Unless the pharmacy meets the elements of the exemption, the third sentence of Section 374 applies equally to pharmacies.

■ Despite the clear language of the statute, Wedgewood argues that this exemption robs the FDA of any jurisdiction over pharmacies licensed by a state. Wedgewood's argument, both on the papers and at oral argument before this court, is a lesson in obfuscation. Wedgewood spends nearly half of its effort discussing the holding and dicta of *Thompson v. Western States Medical Center,* 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002), a decision which invalidated under the First Amendment a portion of 21 U.S.C. § 353a, a section of the FDCA upon which the FDA did not rely in its application for a warrant before this court. Then it spends the balance of its argument discussing the FDA's lack of jurisdiction under 21 U.S.C. § 374(a), the section upon which the FDA did rely in its application for a warrant. Yet, Wedgewood concedes that the FDA's lack of jurisdiction relies upon Wedgewood's representation that it meets the limited exemption for pharmacies contained in Section 374. It is this very representation that the FDA sought to confirm through the administrative inspection. Thus, Wedgewood's argument relies solely on this court's accepting *on faith* Wedgewood's own representation that it meets a statutory exemption that the FDA maintains it has breached.

■ The fundamental problem with this argument is its naive insistence that a court should require the FDA to accept the representation of the very entity it is statutorily charged with policing. When confronted with this logical schism, Wedgewood suggested that the burden should be placed on the agency to prove, in a full declaratory judgment action, that the entity was not entitled to the statutory exemption. However, the interest of the public in the safety and efficacy of pharmaceutical remedies belies this procedure. Because Wedgewood so ardently and avidly opposes this conclusion, as well as the statutory and jurisprudential analysis that compels it, the court shall, in the interest of absolute clarity, review in detail Wedgewood's statutory argument.

In its moving papers, Wedgewood asserts that the first sentence of § 374(a)(1)

gives the FDA the right to "cross the threshold." (Wedgewood Br. at 10). Wedgewood further maintains that the first sentence, including only "general language," does not confer jurisdiction to anything other than enter the establishment: "The first sentence does not explain the purposes for which the agents may enter and what they may inspect for, which is not addressed until the third sentence of 374(a)(1)." (*Id.*). The argument continues that it is the third sentence which "explains that the purpose of the vestibule provision is to inspect '*all things therein* (including records, files, papers, processes, controls, and facilities, etc.')." (*Id.*) (quoting 21 U.S.C. § 374(a)(1) (emphasis in brief)). Hence, Wedgewood concludes, if there is jurisdiction, they may inspect all things, and if there is no jurisdiction, they may inspect no things. (*Id.* at 11). Wedgewood then refers the court to the exemption contained in Section 374(a)(2) (noted *supra*), and argues that if the exemption applies, then there is no jurisdiction. (*Id.*). Finally, Wedgewood repre-

sents that it complies with the exemption section and is thus exempt from the third sentence, which, it maintains, is the only section that describes that which the FDA may inspect. (*Id.*).

In its reply, Wedgewood presents the court with a different statutory analysis. (*See* Wedgewood Reply at 11–15). Wedgewood refers the court to the FDCA's registration provision, 21 U.S.C. § 360, as the "gateway" provision to Section 374. In the reply, Section 374 no longer confers any authority to enter, even in the general sense. Now Wedgewood argues, without reference to legislative history or supporting jurisprudence for its interpretation, that it is only the entities required to be registered under Section 360 whom the FDA is entitled to inspect under Section 374. Specifically, Wedgewood asserts that the FDA's "right to inspect" is "granted" in Section 360(h).[4] (Wedgewood Reply at 12). And the class of entities Congress intended to be registered is contained in Section 360(g).[5] (*Id.*). Notably, Section

**4.** Section 360(h) provides:

(h) Inspection of premises
Every establishment in any State registered with the Secretary pursuant to this section shall be subject to inspection pursuant to section 374 of this title and every such establishment engaged in the manufacture, propagation, compounding, or processing of a drug or drugs or of a device or devices classified in class II or III shall be so inspected by one or more officers or employees duly designated by the Secretary, or by persons accredited to conduct inspections under section 374(g) of this title, at least once in the two-year period beginning with the date of registration of such establishment pursuant to this section and at least once in every successive two-year period thereafter.

**5.** Section 360(g) provides:

(g) Exclusions from application of section
The foregoing subsections of this section shall not apply to—
(1) pharmacies which maintain establishments in conformance with any applicable

local laws regulating the practice of pharmacy and medicine and which are regularly engaged in dispensing prescription drugs or devices, upon prescriptions of practitioners licensed to administer such drugs or devices to patients under the care of such practitioners in the course of their professional practice, and which do not manufacture, prepare, propagate, compound, or process drugs or devices for sale other than in the regular course of their business of dispensing or selling drugs or devices at retail;
(2) practitioners licensed by law to prescribe or administer drugs or devices and who manufacture, prepare, propagate, compound, or process drugs or devices solely for use in the course of their professional practice;
(3) persons who manufacture, prepare, propagate, compound, or process drugs or devices solely for use in research, teaching, or chemical analysis and not for sale;
(4) any distributor who acts as a wholesale distributor of devices, and who does not

360(g)(1) contains the identical exclusion for pharmacies as appears in Section 374(a)(2). In this construct, Section 374 merely "deals with the form, nature and scope of the authorized inspections." (*Id.*). Wedgewood concludes that "[s]ince pharmacies are not regulated under § 360(g)(1), they are not amenable to inspection under § 360(h) and, therefore, the scope and method of inspection set forth in § 374 is [sic] not germane." (*Id.* at 13).

Again, this entire argument misses the import of the actual question before the court, namely, who should and who does bear the initial burden to show whether or not the exemption applies to the pharmacy. That detail notwithstanding, neither of Wedgewood's statutory analyses comports with the statutory language, legislative history, or relevant jurisprudence.

As an initial matter of syntax, Wedgewood's construction of Section 374 is faulty. The first sentence specifically provides that "officers or employees duly designated by the Secretary ... *are authorized* (A) to enter ... and (B) to inspect[.]" 21 U.S.C. § 374(a)(1) (emphasis supplied). The places they may enter or inspect are "any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce, or to enter any vehicle being used to transport or hold such food, drugs, devices, or cosmetics in interstate commerce[.]" 21 U.S.C. § 374(a)(1)(A). This authorization applies so long as the inspection is conducted "[f]or purposes of enforcement of this

chapter" and so long as those FDA officers present "appropriate credentials and a written notice" to a responsible person at the entity to be entered and inspected. *Id.* The first sentence contains additional instruction: the agents may not enter at any time, but "at reasonable times[.]" 21 U.S.C. § 374(a)(1)(A). Moreover, the first sentence places limits on the inspection permitted: it must be conducted "within reasonable limits and in a reasonable manner[.]" 21 U.S.C. § 374(a)(1)(B). Finally, the inspectors may not inspect just anything under the first sentence, but only "the factory, warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials, containers, and labeling therein." 21 U.S.C. § 374(a)(1)(B).

The third sentence of Section 374(a)(1), added in 1962, relates to a different inspection right. In the case of "any factory, warehouse, establishment, or consulting laboratory in which prescription drugs, nonprescription drugs intended for human use, or restricted devices are manufactured, processed, packed, or held," the third sentence extends the right of inspection to "all things therein (including records, files, papers, processes, controls, and facilities)" bearing on whether adulterated or misbranded or otherwise unlawful drugs or devices "have been or are being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on violation of this chapter." 21 U.S.C. § 374(a)(1). It is to this sentence that the exemption contained in Section

---

manufacture, repackage, process, or relabel a device; or

(5) such other classes of persons as the Secretary may by regulation exempt from the application of this section upon a finding that registration by such classes of persons in accordance with this section is not necessary for the protection of the public health.

In this subsection, the term "wholesale distributor" means any person (other than the manufacturer or the initial importer) who distributes a device from the original place of manufacture to the person who makes the final delivery or sale of the device to the ultimate consumer or user.

374(a)(2) applies. And, as noted above, if the pharmacy meets the exemption, then it cannot be inspected under the third sentence.

The court need not rely upon the language of the statute alone to come to this conclusion as to its meaning. The legislative history further clarifies Congress's intent.

The inspection section, 21 U.S.C. § 374, was promulgated with the inception of the FDCA in 1938. At the time, the first sentence of the section was very nearly identical to the current first sentence with one significant difference: it provided authority to enter and inspect "after first making request and obtaining permission of the owner, operator, or custodian" of the factory or other establishment. *See* Senate Report No. 712, 1953 U.S.Code Cong. and Adm. News., 2199. In 1938, the FDCA also included a section making it a violation of the Act to refuse entry or inspection to an FDA representative. *See* 21 U.S.C. § 331(f). Congress intended the statute to provide for inspections without prior notice with a violation for refusal of entry and inspection. *See* Senate Report No. 712, 1953 U.S.Code Cong. and Adm. News., 2199.

In 1953, however, Congress amended the inspection section in response to the Supreme Court decision in *U.S. v. Cardiff*, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952). Congress understood the holding of *Cardiff* to be that the then-provisions of the FDCA did "not clearly provide that the refusal to admit a food and drug inspector constitutes a violation of that act." Senate Report No. 712, 1953 U.S.Code Cong. and Adm. News, 2199–2200. The Court based its decision on a clash in the language of Section 374, which referenced request and permission, with the language of section 331(f), which prohibited the refusal to permit entry or inspection under Section 374. *Id.* The Court held that the FDA could not

sanction an entity for refusing to permit inspectors entry and inspection under the FDCA. Congress felt strongly enough about this right to enter and inspect and the concomitant violation upon refusal that it amended the statute less than one year after the *Cardiff* decision. The Senate report explained: "The situation resulting from the Supreme Court decision is that operators in the food, drug, and cosmetic industries will have an opportunity, through refusal to permit inspection, to disregard with impunity the sanitary and other safeguards in the Federal Food, Drug, and Cosmetic Act." *Id.* The report further noted both the importance of the FDA's authority to inspect, and inspect with refusal resulting in violation of the FDCA, and the authority being vested in the FDA through the 1953 amendment:

> The decision of the Supreme court denying that Congress had granted enforceable inspection power, which is indispensable to the effective enforcement of the act, has, therefore, seriously jeopardized the protective services rendered by the Food and Drug Administration.

> Until this case was decided, the act was interpreted and administered by the Food and Drug Administration, with the concurrence of the overwhelming majority of the responsible trade organizations and members of the food, drug, and cosmetic industries, as granting the Administration the right to insist that its inspectors be permitted to enter and inspect.

> \*   \*   \*   \*   \*   \*

> It is evident to the committee that if the Food and Drug Administration were to be deprived of such authority and were empowered only to make such inspections as are voluntarily agreed to by the persons whose establishments are to be inspected, the Federal Food, Drug, and

Cosmetic Act would become virtually meaningless. . . .

Moreover, such authority would avoid unfair competition from the fringe and racketeer operators that would necessarily force down the present high levels of sanitation, product safety, and honesty and fair dealing.

The inspection powers which were exercised by the Food and Drug Administration prior to the decision in the Cardiff case, and which are provided for by this legislation, are a necessary part of a regulatory scheme intended to protect the health and lives of the public. The inspections are normally a matter of routine checking, primarily as to sanitary and related conditions but also as to product integrity and safety for use, and are not necessarily based on any prior suspicion or determination that the law has been or is being violated. . . .

This legislation does not propose that food and drug inspectors shall have the power of arrest, or the power to use force in order to gain admission to a factory or otherwise carry out an intended inspection. . . . The bill authorizes entry and inspection but does not authorize the inspector to enter the establishment by force. The owner is on notice, however, that he must permit a reasonable inspection. If he refuses such an inspection he is in violation of the act.

*Id.* at 2200–2201. This was the state of the inspection power before the third sentence was added to subsection (a) in 1962.

In 1962, Congress believed that the FDCA needed additional strengthening. Hence, Congress added, *inter alia*, the third sentence of Section 374 [6] as well as the registration section, 21 U.S.C. § 360. The Senate Report specifically noted that "[t]he purpose of the proposed legislation,

as amended, is to strengthen and broaden existing laws in the drug field so as to bring about better, safer medicine and to establish a more effective system of enforcement of the drug laws." Senate Report No. 1744, 1962 U.S.Code Cong. and Adm. News, 2884. Section 374 was "intended to strengthen the Food and Drug Administration's authority to inspect factories in which prescription drugs are manufactured, and to inspect all things therein bearing on whether articles are adulterated or misbranded. Exempted from such inspection are financial data, sales data other than shipment records, pricing data, and personnel data." *Id.* at 2885. As part of this amendment, Section 360 established a new procedure intended to simplify the FDA's control over drugs entering the stream of commerce:

Section 3 of the bill [21 U.S.C. § 360], as amended, would provide a system under which every establishment in which drugs are manufactured or processed would be registered with the Department of Health, Education, and Welfare. The purpose of this provision is to assist the Food and Drug Administration to identify and inspect all places where drugs are being made, and to take appropriate action (by criminal proceedings, injunction, or seizure) against those who fail to register. . . .

\*      \*      \*      \*      \*      \*

The committee believes that drugs should not be on the market unless the Food and Drug Administration knows who is making them, and where they are being made, and is able to inspect the facilities in which they are being made. This will help stop illicit and substandard manufacturers who do not follow the methods or establish the controls called for by good manufacturing practice.

---

**6.** In 1962, what is now referred to as the third sentence was the second sentence. The present second sentence was added by amendment in 2002.

The registration system established by section 3 [21 U.S.C. § 360] of the bill, as amended, is thus a facet of the additional inspection authority provided in section 4 [21 U.S.C. § 374] of this proposal and the provisions on quality manufacturing controls in section 5 of this proposal.

*Id.* at 2888–89. Finally, Section 201(d) of Pub.L. 87–781 provided that: "Nothing in the amendments made by subsections (a) and (b) of this section [amending subsecs. (a) and (b) of Section 374] shall be construed to negate or derogate from any authority of the Secretary existing prior to the enactment of this Act. [Oct. 10, 1962]."

As the legislative history is clear that the FDA had authority through Section 374(a)(1) to enter and inspect prior to 1962, there is no question that following the 1962 amendments that authority was reinforced, not abrogated as Wedgewood urges.

As for Wedgewood's Section 360 analysis, the language and the legislative history noted above make clear that that too is inaccurate. As the legislative history indicates, the registration requirement was added in 1962 as an *additional* method to control the drug manufacturing industry. Section 360(g), the exemption subsection relating to pharmacies in the registration section, is *identical* to the exemption contained in the inspection section. As a matter of pure textual analysis, if an entity had to be registered under Section 360 for the FDA to have any authority to inspect it under Section 374, then there would be no need for the identical exemption in Section 374. Rather, as the legislative history supports, the inspection of premises provision contained in subsection (h) is merely a subset of the inspection power. That is, it imposes additional requirements on those entities who must be registered: they *must* submit to inspection "at least once in the two-year period beginning with the date of registration of such establishment pursuant to this section and at least once in every successive two-year period thereafter." 21 U.S.C. § 360(h). Registered entities were thus put on notice that they would be scheduled for semi-regular inspections. Conversely, Section 374 contains no particular schedule for inspections of entities. Rather, it is within the discretion of the FDA to identify those entities that require inspection "[f]or purposes of enforcement of [the FDCA]." 21 U.S.C. § 374(a)(1). Moreover, the class of entities to be inspected under Section 374— "any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce or after such introduction, or to enter any vehicle being used to transport or hod such food, drugs, devices, or cosmetics in interstate commerce"—is broader than the class of entities subject to registration—"every person who owns or operates any establishment in any State engaged in the manufacture, preparation, propagation, compounding, or processing of a drug or drugs ..." This difference highlights the alternative needs that the sections fill: registration for those entities that produce drugs versus inspection for any entity engaged in the vertically integrated process of bringing drug products to consumers. Thus, based on the statutory language and the legislative history, the court rejects Wedgewood's argument both that Section 374 does not confer authority to inspect and that Section 360 is the gateway to a Section 374 inspection.

One final aspect of the FDCA bears comment here. The FDCA contains provisions with explicit exemptions for the new drug, misbranding, and adulteration provisions. *See, e.g.,* 21 U.S.C. §§ 353(b), 355(i). Neither pharmacies nor compounded drugs are expressly exempted. *See Professionals and Patients for Cus-*

*tomized Care v. Shalala,* 56 F.3d 592, 593 n. 3 (5th Cir.1995). For example, section 355, establishing the "new drugs" requirements, specifically includes an exemption for "drugs intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs." 21 U.S.C. § 355(i). It contains no reference, direct or oblique, to pharmacies or compounded drugs. Section 353(b) recognizes an exemption from section 352, the misbranding provision, for "[a]ny drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug[.]" But that exemption does not apply to misbranding by false or misleading labels, 21 U.S.C. § 352(a), imitating other drugs, 21 U.S.C. § 352(i)(2), offering a drug for sale under the name of another drug, 21 U.S.C. § 352(i)(3), or packaging of drugs, 21 U.S.C. §§ 352(g), (h), and (p). Thus, the principal provisions regarding new drugs, misbranding and adulteration relevant to pharmacies' practice were applied to them. Under the statutory maxim *expressio unis est exclusio alterius,* the exemptions specifically provided for certain entities, *see, e.g.,* 355(i), render general application of the FDCA to pharmacies persuasive. *See Continental Cas. Co. v. U.S.,* 314 U.S. 527, 533, 62 S.Ct. 393, 86 L.Ed. 426 (1942). No exemption from the substantive provisions of the FDCA thus resurrects Wedgewood's statutory analysis, and instead directly refutes that analysis.

This analysis notwithstanding, Wedgewood's feeling that it has operated under lesser scrutiny by the FDA over the years is not without basis, as will be discussed in the next section; however, that feeling is insufficient to overcome the clear legislative intent and reasonable agency interpretation that the court shall address in more detail below.

### C. The FDA's Interpretation of Authority to Inspect under the FDCA

Wedgewood argues that Section 374 does not confer authority to inspect by the FDA's own admission, and thus that the warrant was requested in bad faith and is therefore invalid. This argument relies upon the FDA's statements regarding its authority to inspect pharmacies under the FDCA.

In the seminal decision of *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court addressed the principles of a court's review of an agency's construction of the statute which it administers. In *Chevron,* the court of appeals had rejected the agency's definition of the relevant statutory term. In reversing the court of appeals's decision, the Court opined that "[t]he basic legal error of the Court of Appeals was to adopt a static judicial definition of [a term in the statute] when it had decided that Congress itself had not commanded that definition." *Id.* at 842, 104 S.Ct. 2778. The Court reconfirmed the appropriate deference to agency interpretations:

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute,

we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*Id.* at 844–45, 104 S.Ct. 2778 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)) (footnote and internal citations omitted). Hence, a reviewing court should consider the statutory language with fluidity giving deference to the administrative interpretation. The Court clarified further:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Notwithstanding deference to agency interpretation, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n. 9, 104 S.Ct. 2778.

As discussed above, the court finds both the statute and Congressional intent to be clear with respect to the FDA's authority to inspect under Section 374. Thus, at least with respect to the inspection permitted under the first sentence of Section 374, the FDA had the authority to inspect Wedgewood.[7] The statute does not address, however, the question before this court of how the FDA is to determine whether a pharmacy meets the exemption contained in Section 374(a)(2), and thus has authority to inspect a pharmacy under the third sentence of Section 374.

Despite Section 374's long presence in the statutory scheme, the FDA has never promulgated regulations for Section 374. The FDA, however, has issued statements detailing its interpretation of the scope of the inspection power with respect to pharmacies. This interpretation has been evolving over the past decade, and continues, as Wedgewood points out, to be in a "state of flux." (*See* Statement of Jane Axelrad, Director FDA Center for Drug Evaluation and Research, Office of Regulatory Policy, as reported in *The Pharmacists' eLink,* 4/7/03, attached as Ex. 1 to Wedgewood's Reply).

The FDA initially published its interpretation of its authority under the FDCA with respect to pharmacies as Compliance Policy Guide 7132.16 ("CPG 7132.16") in 1992. Prior to this, the FDA "generally left regulation of compounding to the States." *Western States,* 535 U.S. at 362, 122 S.Ct. 1497. And, indeed, many States "specifically regulate compounding practices as part of their regulation of pharmacies." *Id.* at 361, 122 S.Ct. 1497. Compounding, all parties agree, is a traditional practice of pharmacies. It is the "process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient." *Id.* at 360–61, 122 S.Ct. 1497. Pharmacists compound to provide

---

7. The court is putting aside for a moment the issue of whether the FDA appropriately exercised that authority in the instant warrant and application.

medications either that are not commercially available or are in forms that are not commercially available: diluted doses for children, lozenges rather than pills, omission of an ingredient to account for a patient's allergies. *Id.* at 361, 122 S.Ct. 1497; *Shalala,* 56 F.3d at 593.

As the *Shalala* court explained, "[b]y the 1990's, the FDA had become aware that many establishments with retail pharmacy licenses were purchasing large quantities of bulk drug substances; combining those substances into specific drug products before ever receiving any valid prescriptions; and then marketing those drug products to practitioners and patients." 56 F.3d at 593. CPG 7132.16 addressed the growing concern by the FDA that these practices evidenced pharmacy manufacturing drugs under the guise of compounding to avoid the requirements of the FDCA. *See Shalala,* 56 F.3d at 593; *see also Western States,* 535 U.S. at 362, 122 S.Ct. 1497. The FDA announced the following policy in the CPG:

> FDA recognizes that a licensed pharmacist may compound drugs extemporaneously after receipt of a valid prescription for an individual patient. . . .
>
> Pharmacies that do not otherwise engage in practices that extend beyond the limits set forth in this CPG may prepare drugs in very limited quantities before receiving a valid prescription, provided they can document a history of receiving valid prescriptions that have been generated solely within an established professional practitioner-patient-pharmacy relationship and provided further that they maintain the prescription on file for all such products dispensed at the pharmacy as required by state law.
>
> If a pharmacy compounds finished drugs from bulk active ingredient materials considered to be unapproved new drug substances, as defined in 21 CFR 310.3(g), such activity must be covered

by an FDA-sanctioned investigational new drug application (IND) that is in effect in accordance with 21 U.S.C. Section 355(i) and 21 CFR 312.

> .  .  .  .  .
>
> Pharmacies may not, without losing their status as retail entities, compound, provide, and dispense drugs to third parties for resale to individual patients. FDA will generally continue to defer to state and local officials (sic) regulation of the day-to-day practice of retail pharmacy and related activities . . . .
>
> FDA may, in the exercise of its enforcement discretion, initiate federal enforcement actions against entities and responsible persons when the scope and nature of a pharmacy's activity raises the kind of concerns normally associated with a manufacturer and that results in significant violations of the new drug, adulteration, or misbranding provisions of the Act.

CPG 7132.16 (quoted in *Shalala,* 56 F.3d at 593–94). The policy statement was followed by nine factors the FDA would consider when determining whether to begin an enforcement action against a pharmacy. *See id.* As a CPG, this policy was not binding on pharmacies, but rather constituted an advisory opinion. *Id.* t 596. FDA regulations indicate that advisory opinions "may be used in administrative or court proceedings to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement." 21 C.F.R. § 10.85(j); *see also Shalala,* 56 F.3d at 596. In 1997, Congress, recognizing the gap that this CPG filled in the FDCA, turned portions of this CPG into law when it enacted the Food and Drug Administration Modernization Act, 21 U.S.C. § 353a. The FDAMA specifically exempted pharmacy compounding from section 351(a)(2)(B) regarding adulterated drugs and good manufacturing practices, section

352(f)(1) regarding labeling, and section 355 regarding new drugs. Notably, even the exemption contained in the FDAMA did not exempt pharmacies from every relevant provision in the FDCA. Nevertheless, the "new drug" exemption for traditional pharmaceutical compounding practices represents a significant exemption.

Before the FDAMA took effect, a coalition of licensed pharmacies challenged the constitutionality of one of the provisions in the new act—that precluding solicitation through advertising and promotion of pharmaceutical compounds by pharmacies—as an unconstitutional restriction on commercial speech. *See Western States*, 535 U.S. at 365, 122 S.Ct. 1497; *see also* CPG 460.200. In February 2001, the United States Court of Appeals for the Ninth Circuit held that the speech restrictions included as conditions for the exemption in section 353a violated the First Amendment and further held that the speech restrictions not severable from the whole, thus ruling section 353a unconstitutional in its entirety. *Western States Medical Center v. Shalala*, 238 F.3d 1090 (9th Cir.2001). The parties appealed to the Supreme Court which granted *certiorari* "to consider whether the FDAMA's prohibitions on soliciting prescriptions for, and advertising, compounded drugs violate the First Amendment." *Western States*, 535 U.S. at 366, 122 S.Ct. 1497. The Court specifically noted that "[b]ecause neither party petitioned for *certiorari* on the severability issue, we have no occasion to review that portion of the Court of Appeals' decision." *Id.* Thus, the Ninth Circuit decision with respect to severability remains, and neither Wedgewood nor the FDA looks to section 353a as a viable basis for decision making.

The Court's *Western States* decision, issued on April 29, 2002, sent the FDA back to the proverbial drafting room to develop a revised CPG governing compounding and pharmacies. In May 2002, the FDA issued a new CPG, CPG 460.200, and explained its purpose in the following way:

> This document provides guidance to drug compounders and the staff of the Food and Drug Administration (FDA) on how the Agency intends to address pharmacy compounding of human drugs in the immediate future as a result of the decision of the Supreme Court in *Thompson v. Western States Medical Center*, 535 U.S. 357, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002). FDA is considering the implications of that decision and determining how it intends to regulate pharmacy compounding in the long term. However, FDA recognizes the need for immediate guidance on what types of compounding might be subject to enforcement action under current law. This guidance describes FDA's current thinking on this issue.

CPG 460.200, Introduction. The FDA reconfirmed its long-term position that it would not attempt to regulate traditional compounding practices: "FDA recognizes that pharmacists traditionally have extemporaneously compounded and manipulated reasonable quantities of human drugs upon receipt of a valid prescription for an individually identified patient from a licensed practitioner. This traditional activity is not the subject of this guidance." Echoing the earlier CPG, the revision expands on the FDA's thinking:

> FDA believes that an increasing number of establishments with retail pharmacy licenses are engaged in manufacturing and distributing unapproved new drugs for human use in a manner that is clearly outside the bounds of traditional pharmacy practice and that violates the Act. Such establishments and their activities are the focus of this guidance. Some "pharmacies" that have sought to find shelter under and expand the scope of the exemptions applicable to traditional

retail pharmacies have claimed that their manufacturing and distribution practices are only the regular course of the practice of pharmacy. Yet, the practices of many of these entities seem far more consistent with those of drug manufacturers and wholesalers than with those of retail pharmacies. For example, some firms receive and use large quantities of bulk drug substances to manufacture large quantities of unapproved drug products in advance of receiving a valid prescription for them. Moreover, some firms sell to physicians and patients with whom they have only a remote professional relationship. Pharmacies engaged in activities analogous to manufacturing and distributing drugs for human use may be held to the same provisions of the Act as manufacturers. CPG 460.200, Discussion. The CPG then announced a policy and nine factor analysis similar to the earlier CPG:

### POLICY

Generally, FDA will continue to defer to state authorities regarding less significant violations of the Act related to pharmacy compounding of human drugs. FDA anticipates that, in such cases, cooperative efforts between the states and the Agency will result in coordinated investigations, referrals, and follow-up actions by the states.

However, when the scope and nature of a pharmacy's activities raise the kinds of concerns normally associated with a drug manufacturer and result in significant violations of the new drug, adulteration, or misbranding provisions of the Act, FDA has determined that it should seriously consider enforcement action. In determining whether to initiate such an action, the Agency will consider whether the pharmacy engages in any of the following acts:

1. Compounding of drugs in anticipation of receiving prescriptions, except in very limited quantities in relation to the amounts of drugs compounded after receiving valid prescriptions.

2. Compounding drugs that were withdrawn or removed from the market for safety reasons. Appendix A provides a list of such drugs that will be updated in the future, as appropriate.

3. Compounding finished drugs from bulk active ingredients that are not components of FDA approved drugs without an FDA sanctioned investigational new drug application (IND) in accordance with 21 U.S.C. § 355(i) and 21 CFR 312.

4. Receiving, storing, or using drug substances without first obtaining written assurance from the supplier that each lot of the drug substance has been made in an FDA-registered facility.

5. Receiving, storing, or using drug components not guaranteed or otherwise determined to meet official compendia requirements.

6. Using commercial scale manufacturing or testing equipment for compounding drug products.

7. Compounding drugs for third parties who resell to individual patients or offering compounded drug products at wholesale to other state licensed persons or commercial entities for resale.

8. Compounding drug products that are commercially available in the marketplace or that are essentially copies of commercially available FDA-approved drug products. In certain circumstances, it may be appropriate for a pharmacist to compound a small quantity of a drug that is only slightly different than an FDA-approved drug that is commercially available. In these circumstances, FDA will consider whether there is documentation of the medical need for the particular variation of the compound for the particular patient.

9. Failing to operate in conformance with applicable state law regulating the practice of pharmacy.

CPG 460.200. Again, the FDA indicated that it did not intend the list to be exhaustive and that "other factors may be appropriate for consideration in a particular case." *Id.* Thus, the revised CPG put pharmacies on notice of the FDA's interpretation of the FDCA following *Western States.* Thus interpretation does not bespeak lack of jurisdiction, but rather returns largely to the pre-*Western States* model, albeit without the commercial speech references and with additional clarification.

■ Under *Chevron,* this court finds that the CPG is a reasonable interpretation of the statutory scheme established by the FDCA. The Supreme Court directed that statutes should not be regarded with rigidity. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. And Congress intended that the FDCA, both in its original form and as amended, allow the FDA broad enforcement powers to fulfill its mandate that it protect the public from unsafe medication. While the FDCA by its own terms would permit the FDA to require all pharmacy compounding to undergo the rigors of the "new drug" requirements, the FDA has recognized the essential need for individually tailored medication and the economic realities that those individually tailored medications would not be available if pharmaceutical compounding had to meet the new drug requirements. Indeed, the Supreme Court recognized this as an important governmental interest in *Western States:*

> Preserving the effectiveness and integrity of the FDCA's new drug approval process is clearly an important governmental interest, and the Government has every reason to want as many drugs as possible to be subject to that approval process. The Government also has an important interest, however, in permitting the continuation of the practice of compounding so that patients with particular needs may obtain medications suited to those needs. And it would not make sense to require compounded drugs created to meet the unique needs of individual patients to undergo the testing required for the new drug approval process. Pharmacists do not make enough money from small-scale compounding to make safety and efficacy testing of their compounded drugs economically feasible, so requiring such testing would force pharmacists to stop providing compounded drugs. Given this, the Government needs to be able to draw a line between small-scale compounding and large-scale drug manufacturing. That line must distinguish compounded drugs produced on such a small scale that they could not undergo safety and efficacy testing from drugs produced and sold on a large enough scale that they could undergo such testing and therefore must do so.

*Western States,* 535 U.S. at 369–370, 122 S.Ct. 1497. The Court did not question the importance of this interest, or the exigencies necessitated by economic realities. Notably, the Court, in rejecting the speech-related provisions of the FDAMA, commented favorably on the non-speech-related factors identified in the FDA's original CPG as a means of drawing a line between traditional compounding and large-scale manufacturing. The Court opined: "First, it seems that the Government could use the very factors the FDA relied on to distinguish compounding from manufacturing in its 1992 Guide." The Court specifically referenced the use of commercial scale manufacturing equipment for compounding, excessive volume, wholesale distribution of compounded drugs, production matched to prescriptions, all as possible venues to identify and

prevent "compounding from occurring on such a scale as to undermine the new drug approval process." *Id.* at 372, 122 S.Ct. 1497. Thus, this court finds that the FDA's interpretation of the FDCA is based on a permissible construction of the statute under *Chevron.*

■ The CPG's notwithstanding, Wedgewood derives its belief of bad faith from two statements that postdate the 2002 CPG. The first statement was made by Jane Axelrad, Director of the FDA's Center for Drug Evaluation and Research, Office of Regulatory Policy, and reported in *The Pharmacists' eLink,* an internet publication sponsored by the *International Journal of Pharmaceutical Compounding.* In this brief, two-paragraph article dated April 7, 2003 and entitled "FDA Announces Plans to Issue a New Compounding CPG," Director Axelrad is attributed the statement that "FDA is considering legislation to 'regain the statutory authority to regulate compounding.'" (Wedgewood Reply, Ex. 1). And that "Axelrad indicated that compounding has been in a 'state of flux' ever since the *Western States* Supreme Court decision last year." (*Id.*). *The Pharmacists' eLink* reprinted this statement from another article, "FDA to Revise Draft Drug Compounding Guidance," published in the *Drug Industry Daily,* vol. 2, No. 66, 3 Apr. 2003.

The second statement was made by William McConagha, Associate Chief Counsel of the FDA, at a seminar presentation given at the APHA 2003 Meeting. (*See* T.4:6–10, 15:10–17:13). In his presentation, Mr. McConagha recognized that the FDA's inclusion of ownership or use of an encapsulating machine as a basis for increased scrutiny of a pharmacy's compounding as controversial in the industry. (*Id.*). Wedgewood, while recognizing that these statements do not bind the agency, points to these statements as indicative of "a state of mind, and interpretation of

their own rules." (T17:11–13). Together, Wedgewood argues, these statements evidence the FDA's knowledge that it did not have jurisdiction over state-licensed pharmacies, and thus the application was made in bad faith.

Wedgewood's argument again is unavailing. First, with respect to Mr. Axelrad's statement, it was a second-hand reporting of a portion of a sentence taken outside of its original context. Taken together, the two snippets of statements—"regain the statutory authority to regulate compounding" and "state of flux"—do not refute the position taken by the FDA in the CPG. The CPG itself announced that it was being issued fast on the heels of *Western States* so as to fill the gap following the constitutional invalidity of the FDAMA. And the CPG indicates that the FDA continues to consider how it will "regulate pharmacy compounding in the long term." Hence, the FDA's position remains a fluid interpretation of the FDCA just as this court's own review of the FDCA must remain fluid. *See Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Mr. McConagha's statement does no more than identify a conflict among the agency and the entities that it regulates. It does not conflict in any way with the FDA's announced "advisory opinion" on pharmacy compounding in CPG 460.200. Consequently, these statements do not support a finding that the FDA sought the warrant against its own interpretation of the statute with the intent to misrepresent its authority under the FDCA to this court in bad faith.

Despite the extended statutory analysis above, the question before the court is different from that which the parties specifically addressed in their papers. The FDA sought leave to inspect Wedgewood under Section 374 both under the first sentence and the third sentence. The FDA did not present, nor does it contend

that it has, conclusive proof that the exemption for pharmacies contained in Section 374(a)(2)(A) does not apply to Wedgewood. As such, they seek inspection under Section 374 prior to establishing conclusively whether or not the exemption applies.

■ The court recognizes the statutory paradox: the exemption in Section 374(a)(2)(A) divests the FDA of authority to inspect in some limited fashion, but the FDA cannot establish whether or not the exemption applies without obtaining information. The question for resolution then under *Chevron* is whether the FDA's choice to determine whether the exemption applies to Wedgewood by obtaining a warrant for a full Section 374 inspection " 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.' " *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)). If the choice is reasonable, this court should not disturb it " 'unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " *Id.*

From the FDCA's enactment, Congress has considered the inspection power to be central to protection of the public health. Indeed, each amendment serves to strengthen the inspection power granted to the FDA. For example, in connection with the 1953 amendment, Congress noted that it considered "enforceable inspection power to be indispensable to the effective enforcement of the act." Senate Report No. 712, 1953 U.S.Code Cong. and Adm. News, 2199. Congress so believed in the broad power of inspection that it remarked that "if the Food and Drug Administration were to be deprived of such authority and were empowered only to make such inspections as are voluntarily agreed to by the persons whose establishments are to be inspected, the Federal Food, Drug, and Cosmetic Act would become virtually meaningless." *Id.* at 2200.

In 1962, Congress again strengthened the inspection authority providing the FDA with additional inspection powers. The exemption for pharmacies included in the 1962 amendments was a recognition of the efficacies of traditional pharmacy practice. It was not a pronouncement that pharmacies should be outside the discretionary review of the FDA altogether. Yet, the legislative remarks accompanying the text cannot be ignored. The Senate Report indicated that "the provisions of subdivision (3) are specifically not applicable to pharmacies, licensed practitioners, or research, teaching, and analysis operations." It also notes that "the Secretary has been granted discretion to exempt other classes of persons." Senate Report No. 1744, 1962 U.S.Code Cong. and Adm. News, 2889. Thus, the Secretary has been given discretion over exemptions contained in Section 374, but in Congress's view, certain exemptions are predetermined.

This court finds that the Senate Report remarks concerning pharmacy exclusion can be reconciled with the FDA's position in the instant matter. The remarks of Congress must be read in the context of the actual power granted in Section 374: the power to inspect *without* a warrant and the authority to establish a violation of the Act upon refusal of that power. As was discussed above in the context of the *Colonnade–Biswelll* exception, that is an awesome power subject to the "unbridled discretion [of] executive and administrative officers." *Barlow's,* 436 U.S. at 323, 98 S.Ct. 1816. However, the remedy for such limitless exercise of power is to obtain a warrant, not to prevent the inspection. The warrant has the quality of assuring the owner or operator of an establishment subject to inspection that "reasonable leg-

islative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment]." *Camara,* 387 U.S. at 538, 87 S.Ct. 1727; *Barlow's,* 436 U.S. at 323, 98 S.Ct. 1816. The warrant is the vehicle through which the FDA's otherwise unbridled discretion will be monitored and limited. Through an administrative warrant, the FDA submits its position to a neutral judicial officer who will then make the reasonableness determination compelled by the Fourth Amendment. The *ex parte* application serves to allow for maintenance of the status quo in this very serious of public health areas.

The alternative suggested by Wedgewood—to require the FDA to bring a declaratory judgment action in every case in which they believe a pharmacy may be violating the FDCA—is not a workable solution. First, the resources required to file and proceed through a suit—both by the FDA and by the pharmacy who may be the target of the inspection—cannot be underestimated. Indeed, it is not inconceivable that the cost of the litigation would rival the cost of complying with the new drug requirements of the FDCA. Second, the time necessary to take a law suit from filing to completion would undoubtedly threaten the public health. In the best of circumstances, simply the discovery phase of litigation takes months to complete. Third, the information sought to be obtained through the inspection would become the world of documents and other information that is the subject of the investigation. So, the FDA would have access to the documents and information in the context of discovery, prior to the ruling on their right to see the documents in an investigation. Finally, and most importantly, Congress's principal concern in Section 374 was the establishment of regulatory authority sufficient to address the problem of unsafe drugs and the protection of the public health. The FDA in the

instant application sought a warrant for enforcement of the FDCA. If the court required the government to expend scarce resources and significant time in litigation every time they sought to conduct an inspection of a pharmacy to determine whether or not an enforcement action should be commenced, it will take valuable resources away from pursuing those entities against whom they have decided to initiate enforcement action, not to mention frustrating the informational purposes of the inspection authority. And, as the instant motion attests, if a pharmacy feels that the warrant has been improvidently issued, it may file a motion to quash that warrant and recover the information obtained.

In light of the purposes of the statutory scheme and the legislative history confirming the significant role of that statutory scheme in the maintenance of public health, the court finds that permitting the FDA to obtain a warrant to conduct an inspection under both the first and third sentences of 21 U.S.C. § 374(a)(1) is "a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778.

**D. Validity of the Warrant Under the Barlow's/Camara Fourth Amendment Criteria**

██ Finding that the FDA has properly exercised its authority under the FDCA in applying for the warrant does not end the court's analysis. The court must now turn to the actual warrant and whether it was a reasonable exercise of the FDA's authority under the Fourth Amendment.

First, the court must determine whether the type of inspection is a "reasonable" search of private property within the meaning of the Fourth Amendment. *Camara,* 387 U.S. at 538, 87 S.Ct. 1727. "In

determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of the[ ] reasonable goals of code enforcement." *Id.* at 535, 87 S.Ct. 1727. Here, the FDA listed a number of practices by Wedgewood that appeared to indicate that it was not in compliance with certain sections of the FDCA. The information upon which the FDA based its application included the "inter-agency" effort related to the theft of controlled drug substances, the potential continued production of Poison Ivy Extract in large quantity without prescription, the receipt of an encapsulation machine, use of a commercial scale mixer, evidence that Wedgewood is compounding drugs that are copies of commercially available drugs, the bulk purchase of certain drugs including diazepam, boldenone undecylenate, stanozolol, as well as bulk excipient materials. These practices at the very least raise red flags under CPG 460.200. If substantiated, these practices could establish several violations of the FDCA, including those related to mislabeling, new drugs, and registration.

In submissions characterized by colorful accusations and exclamatory punctuation, Wedgewood simply rejects that the new drug requirements could constitute reasonable enforcement: "In an attempt to filch jurisdiction over compounds, the FDA, as of late, has seized upon the ploy that compounds are actually 'new drugs' under 21 U.S.C. § 321(p)(1) in the case of drugs intended for humans, and 21 U.S.C. § 321(v)(1) in the case of drugs intended for animals. The FDA is wrong and knows it!" (Wedgewood Reply Br. at 15). Wedgewood's point again in this section is that "*any* drug preparation by a pharmacy is beyond FDA scrutiny and permitted activity; and no distinction is made between pharmacy manufacturing and phar-

macy compounding." (*Id.*). Wedgewood further argues that compounds cannot be "new drugs" as the statute requires new drugs to undergo "expert evaluation for safety and effectiveness." (*Id.*). Compounding does not lend itself to these rigors. (*See id.* at 15–17). The court does not dispute the efficacies of compounding. Instead, the argument that Wedgewood interposes misses the point that the FDA is seeking information to determine whether Wedgewood's activities fall within the strictures of compounding or are manufacturing activities masquerading as compounding:

In addition to its statutory objection, Wedgewood attempts to discredit some, although not all, of the factual information presented by the FDA in its application. For example, with respect to the Poison Ivy Extract, Wedgewood argues that while the FDA was correct in 1998 that it was in violation of the Act, it is not correct today. (*See* Wedgewood Br. at 13). Wedgewood supplies no support for this bald assertion, documentary or otherwise. Rather, Wedgewood relies upon the one-page affidavit of its owner which merely states that all information contained within the motion is accurate. With respect to the encapsulating machine, Wedgewood retorts "So what!" (*Id.* at 13). Again, this does not suffice to counter the FDA's affidavit in support of the warrant. As to the diazepam, Wedgewood admits that a purchase of 11.5 kilograms "is a lot." (*Id.* at 14). It then attempts to explain the amount by explaining the use to which the diazepam is put and suggesting that the warrant "assumes that all the diazepam was used during that six months." (*Id.* at 15). Wedgewood did not state that it was *not* used in the six months; but only asserts the rhetorical argument. The answers to all of these questions can be established upon inspection. Indeed, the answers may result in the FDA taking no enforcement

action. But the administrative inspection on the warrant of a neutral officer is the appropriate process by which to determine whether the safety and health of the public is threatened. The need for the public to have drug safety concerns addressed in a timely and efficient manner outweighs Wedgewood's desire to have the initial determination made upon final decision in a declaratory judgment suit. Thus, the court finds that the type of inspection requested here is reasonable.

Second, the court must consider whether "reasonable legislative or administrative standards for conducting [the particular inspection] are satisfied with respect to a particular dwelling." *Id.* This should be an individualized review based upon the specific enforcement scheme. *Id.; Barlow's,* 436 U.S. at 322–34, 98 S.Ct. 1816. As discussed above, the FDA has not exceeded its authority in requesting an inspection under Section 374(a)(1). Moreover, the FDA's application requested information that did not exceed that authority. The FDA sought a search of "(1) ... Wedgewood Pharmacy facilities, and all things therein, including equipment, finished and unfinished materials, containers, labeling, records (including electronic and computer records), files, papers, processes, controls, and facilities, bearing on whether prescription drugs intended for human use and prescription and non-prescription animal drugs which are adulterated or misbranded within the meaning of the Act, or which may not be manufactured, introduced into interstate commerce, sold, or offered for sale by reason of any provision of the Act, have been or are being manufactured, processed, packed, transported, or held in such facilities, or otherwise bearing on violation of the Act; (2) to collect samples as deemed necessary by FDA; and (3) to take photographs as deemed necessary by FDA." (Warrant App. at ¶ 24). The items identified fall within the statute. Moreover, the

inspection, conducted by duly designated FDA inspectors, upon presentation of the warrant and statutory notice, during regular business hours, without damage to the property, satisfies the legislative and administrative standards for conducting the administrative inspection. Thus, the court finds that the reasonable legislative standards were satisfied with respect to the FDA's inspection of Wedgewood's facilities.

## IV. CONCLUSION

For the reasons noted above, the court finds that the FDA has jurisdiction to inspect Wedgewood under the FDCA and that the FDA appropriately exercised its jurisdiction in both the application for a warrant and its execution to date. The warrant is valid and the motion to quash shall be denied.

An appropriate order shall enter this date.

### ORDER

Presently before the court is the motion of Frank A. Luchak, Esquire, counsel for Wedgewood Village Pharmacy, Inc., d/b/a Wedgewood Pharmacy, to quash a warrant for administrative inspection issued *ex parte* by this court to the United States Food and Drug Administration on March 10, 2003, pursuant to the Federal Food, Drug, Cosmetic Act, 21 U.S.C. § 301, *et seq.;* and the court having considered the submissions of the parties; and the court having further considered the argument of counsel conducted on the record on May 22, 2003; and for the reasons set forth in the court's opinion of this date;

IT IS this *7th* day of July, 2003 hereby

**ORDERED** that Wedgewood's motion to quash shall be **DENIED.**